**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**_____ DIVISION**

Case No. **05-20530  CIV-ALTONAGA**

MAGISTRATE JUDGE
BANDSTRA

FILED BY: _____ D.C.

2005 FEB 23  PM 12:33

**CITY OF CORAL GABLES**
**RETIREMENT SYSTEM,**

       Plaintiff,

v.

**INVESCO INSTITUTIONAL**
**(N.A.), INC.,**

       Defendant.

_____/

## NOTICE OF REMOVAL

      Defendant Invesco Institutional (N.A.), Inc. ("Invesco"), by its undersigned

attorneys, hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441 and 1446,

and thereby removes this action to the United States District Court for the Southern District of

Florida.

      The grounds for removal are as follows:

      1.    There is now pending in the Circuit Court of the 11th Judicial Circuit, in

and for Miami-Dade County, Florida, a civil action styled City of Coral Gables Retirement

System v. Invesco Institutional (N.A.), Inc., Case No. 05-01565  CA (11).

007.161914.1



2.      The Complaint was filed on January 21, 2005.  Invesco is the only named defendant to the lawsuit.

3.      As alleged in paragraph 2 of the Complaint, plaintiff City of Coral Gables Retirement System (the "Plaintiff") is a subdivision of the City of Coral Gables, Florida.

4.      As alleged in paragraph 3 of the Complaint, Invesco is a Delaware corporation with its principal place of business in Georgia.

5.      As stated on page 12 of the Complaint, the Plaintiff seeks actual damages "in an amount in excess of $200,000" on both the Plaintiff's breach of contract claim and breach of fiduciary duty claim against Invesco, the two claims alleged in the Complaint.

6.      Pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(c)(1), this Court has original jurisdiction over this action in that it is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.      On January 25, 2005, the Summons and Complaint were served on Invesco.  Therefore, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

8.      Copies of all process, pleadings, and orders served and otherwise received to date in this action are attached to this Notice of Removal.[1]

9.      Promptly upon filing this Notice of Removal, Invesco will file a copy of this Notice of Removal with the Clerk of the Circuit Court of the 11th Judicial Circuit, in and for

---

[1] On February 9, 2005, prior to the removal of this action, the Plaintiff's counsel agreed that Invesco could serve its response to the Complaint by March 7, 2005.

007.161914.1

Miami-Dade County, Florida, and will provide written notice thereof to Plaintiff, in accordance with 28 U.S.C. § 1446(d).

**WHEREFORE,** having fulfilled the statutory requirements for the removal of this matter, Invesco hereby removes this action.

**I HEREBY CERTIFY** that a true and accurate copy of this Notice of Removal has been furnished by U.S. mail to CURTIS CARLSON, PAYTON & CARLSON, P.A., 1200 Suntrust International Center, One Southeast Third Avenue, Miami, Florida 33131, this 23rd day of February, 2005.

Richard S. Davis
Florida Bar No. 991082
FOLEY & LARDNER LLP
777 South Flagler Drive
Suite 901 -- West Tower
West Palm Beach, Florida 33401
Telephone:      (561) 650-0140
Facsimile:      (561) 655-6925
E-mail:         rdavis@foley.com

James M. Landis
Florida Bar No. 0116760
FOLEY & LARDNER LLP
100 North Tampa Street
Suite 2700
Tampa, Florida 33602
Telephone:      (813) 229-2300
Facsimile:      (813) 221-4210
E-mail:         jlandis@foley.com

*Attorneys for defendant*
*Invesco Institutional (N.A.), Inc.*

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 05-01565 CA 11

CITY OF CORAL GABLES
RETIREMENT SYSTEM,

        Plaintiff,

vs.

INVESCO INSTITUTIONAL (N.A.), INC.,
f/k/a Invesco, Inc., f/k/a Invesco Capital
Management, Inc., f/k/a Citizens &
Southern Investment Counseling, Inc.

        Defendant.

_____/

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff City of Coral Gables Retirement System (the "Retirement System"), by

undersigned counsel, hereby sues Defendant Invesco Institutional (N.A.), Inc., formerly known as

Invesco, Inc., Invesco Capital Management, Inc., and Citizens & Southern Investment

Counseling, Inc. ("Invesco"), and alleges the following:

### JURISDICTION AND VENUE

    1.    This is an action for breach of contract and breach of fiduciary duty

wherein the amount in controversy exceeds the sum of $200,000, exclusive of interest and costs.

    2.    The Plaintiff, City of Coral Gables Retirement System, was created

pursuant to Chapter 19 (56), City Code, Retirement Board Ordinance No. 2887, Ordinance No.

3217, and is a subdivision of the City of Coral Gables.  The Retirement System is a defined

1

benefit plan that was established to provide retirement benefits to its participants. As such, the Retirement System is a public pension fund. In order to pay benefits, the Retirement System maintains an investment portfolio, and hires professionals to manage portions of the investment portfolio pursuant to several investment styles.

3.     Defendant Invesco is a corporation that is organized under the laws of the State of Delaware and maintains its principal place of business in the State of Georgia. Defendant Invesco is in the business, among other things, of providing investment management services to public pension funds. Defendant Invesco is authorized to and does business in the State of Florida and, as such, Defendant Invesco has been assigned Document No. P22363 by the Secretary of State of Florida.

4.     The causes of action alleged herein accrued in Miami-Dade County, Florida.

## FACTUAL BACKGROUND

### A.     The Investment Management Agreement

5.     Defendant Invesco serves as an investment manager of investment portfolios of pension plans. Defendant Invesco touts itself as having "[a] dedicated commitment to working with our clients to provide solid and comprehensive support. Within the parameters of each investment style and product our goal remains the same: to deliver above-average returns over the long term in accordance with client goals." Defendant Invesco claims that "We understand that issues such as risk tolerance and the balance between income generation and capital preservation/appreciation can be quite different for public pension fund clients versus other types of organizations. " In other words, Invesco understands that it is required to manage

2

**PAYTON & CARLSON, P.A.**

Case 1:05-cv-20530-CMA   Document 1   Entered on FLSD Docket 02/24/2005   Page 6 of 21

a portfolio within the investment style for which it has been retained and Invesco cannot take on the same level of risk for a public pension fund that it would for other pension plans.

6.     Prior to 2000, the Retirement System and Invesco entered into an agreement whereby Invesco agreed to serve as an Investment Manager for the Retirement System. A copy of the Managment Agreement is attached as Exhibit 1. Prior to 2000, the Retirement System and Invesco agreed that Invesco would adhere to the investment style that is known as Large Cap Value for the portion of the Investment Portfolio managed by Invesco. Invesco assigned its Fundamental Value Equity team to manage that portion of the Retirement System's Investment Portfolio.

7.     Pursuant to the Management Agreement, Invesco agreed to do the following:

     a.     Assign competent professionals to perform the services;

     b.     Perform such services in a competent and professional manner;

     c.     Act in the best interests of the Retirement System; and

     d.     Act for the Retirement System loyally and with reasonable skill and diligence.

8.     At all material times, Invesco knew and understood that the Retirement System had the need to preserve assets and to limit the level of risk with respect to the overall portfolio and specific asset allocation segments in the investment portfolio.

9.     In addition, pursuant to their oral agreement, Invesco agreed to adhere to purchasing what is known as Large Cap Value stocks.

3

.... Tun Trust International Center, One Southeast Third Avenue, Miami, Fl. 33131, 305 372 3500

B.    **The History of Enron**

10.    Enron was created in 1985 when the Houston Natural Gas Company of Huston, Texas merged with InterNorth, a natural gas company based in Omaha, Nebraska. Originally, Enron was an operator of interstate gas pipelines, but by 1989 Enron diversified into trading energy-related commodities.

11.    In 1991, Enron began to use "mark-to-market" accounting to record the natural gas trades of its newly formed subsidiary, Enron Gas Services (EGS). Using mark-to-market accounting meant that when EGS entered into a natural gas contract, it would book the present value of all future profits from that contract at the time the contract was signed, in contrast to traditional accounting methods that would have required that the company spread out the recognition of revenue over the life of the contract. Any changes in the value of the contract once it had been recorded on EGS's books – and the contracts were required to be revalued quarterly – would, under mark-to market principles, be reflected as subsequent increases or decreases in revenue on the company's income statement. EGS's accounting, moreover, would carry over onto Enron's consolidated balance sheet.

12.    Mark-to-market accounting, however, is not without its problems – some significant. Most importantly, it was questionable whether Enron could accurately value these contracts at the time of signing. For short-term, standard form contracts, there is often a public market, such as the New York Mercantile Exchange, that can provide the necessary values. For longer-term or more complex trading contracts, there would likely not be market quotes available on which to base the values. Instead, Enron would use complex models to estimate the value of these contracts, making assumptions about an assortment of variables that could range from

4

future gas prices to the pace of energy deregulation to trends in interest rates. The assumptions underlying these models were, in the best case, necessarily subjective and, in the worst, subject to deliberate manipulation.

13.    Enron, at a minimum, overestimated and very possibly manipulated the values of the energy contracts it marked to market. Enron's misuse of mark-to-market accounting has been most widely reported in connection with the activities of Enron Energy Services (EES), the company's retail energy subsidiary (Enron ultimately used mark-to-market accounting at subsidiaries beyond EGS). As the deals came to maturity, however, the assumptions underlying the valuations in many cases proved incorrect and the contracts had to be revalued. By spring 2001, Enron would have had to report significant losses from these deals, had it not merged the commodity risk activities of EES with those of Enron's Wholesale Services group, effectively hiding these losses amid that group's substantially larger revenues and allowing the remaining part of EES to appear profitable.

14.    For the year 2000, Enron's unrealized trading gains – that is, the profits it expected to earn in future years – constituted over half the company's $1.41 billion originally reported pre-tax profit. Of the basis for the company's mark-to-market valuations, the Forms 10-K that Enron filed with the SEC for the years 1997 onward state that "[t]he market prices used to value these transactions reflect management's best estimate considering various factors including closing exchange and over-the-counter quotations, time value and volatility factors underlying the commitments."

15.    Meanwhile, by 1994, Enron became the largest seller of electricity in the United States. In 1997, Enron began a program to reshape its corporate image to a new, more

5

modem, stylish-looking company. It introduced a new corporate logo and acquired Zond Corporation, one of leading developers of wind energy power. The purchase of Zond lead to the formation of the Enron Renewable Energy Corporation.

16.     By August of 1997, Enron had created new weather derivative products (bets against certain weather conditions) and was buying and selling cellulose, pulp, paper, fertilizer, plastics, metals and bandwidth.

17.     In July, 2001, amidst rolling blackouts in California, Pacific Gas and Electric Company filed for bankruptcy. Pacific Gas and Electric Company was one of the three major utility companies in the region, along with Southern California Edison and San Diego Gas & Electric Company.

18.     On August 14, 2001, Enron CEO Jeff Skilling resigned stating "personal reasons."

19.     On October 12, 2001, Enron announced that it had a $638 million loss during the third quarter of fiscal year 2001.

20.     On October 16, 2001, Enron announced a $1 billion charge to earnings.

21.     On October 17, 2001, the *Wall Street Journal* broke the story of Enron's financial shenanigans involving related-party transactions with partnerships headed by Enron's own chief financial officer, Andrew Fastow.

22.     On October 24, 2001, Enron announced that Andrew Fastow was fired as the chief financial officer because of his involvement into questionable business transactions and partnerships.

23.     October, 27, 2001, Enron announced that it borrowed more than $3 billion

6

in a move to stay afloat.

24.     On October 31, 2001, the Securities and Exchange Commission (SEC), which was already conducting an informal investigation into Enron's dealings, upgraded its inquiry into Enron's dealings into a formal investigation on Enron's business transactions and accounting records.

25.     On November 1, 2001, Enron announced it obtained yet another $1 billion in new loans, using its pipelines as collateral.

26.     On November, 8, 2001, Enron announced that it had overstated earnings over the past four years by $586 million and was responsible for $3 billion in obligations that were never reported to the public. Upon these disclosures, Enron stock fell to $8.41 a share. The revision lead to reduced earnings by an additional US $586 million over the past four years, in large part due to losses with shady partnerships. It is also disclosed that Mr. Fastow earned $30 million in assorted fees he charged and with profits from his involvement with the outside partnerships. Enron also announced it must pay $690 million in debt and another $6 billion of debt would be due by next year.

27.     On November 9, 2001, Dynegy, a much smaller energy company, offered a rescue plan for Enron and proposed a buy-out of the entire Enron for $10 billion in stock. Dynegy also agreed to pay back more than $13 billion of Enron's debts, and Dynegy's major shareholder, ChevronTexaco, promised to provide Enron with an immediate $1.5 billion in operational funding.

28.     Less than a month later Enron filed for bankruptcy – the largest corporate bankruptcy ever. Enron's sudden collapse left thousands of Enron investors holding virtually

7

worthless stock.

**C.     The Warning Signs were Available to Read.**

29.     In the March 5, 2001 edition of *Fortune*, reporter Bethany McLean asked

the question, "Is Enron Overpriced?" As she presciently noted, "It's in a bunch of complex

businesses. Its financial statements are nearly impenetrable. So why is Enron trading at such a

huge multiple [of earnings per share]?" In her story, analysts joked about Enron's opaque

financial statements; even analysts from credit rating agencies Standard & Poor's and Fitch said

they could not figure out Enron's numbers. McLean warned that "the inability to get behind the

numbers combined with ever higher expectations for the company may increase the chance of a

nasty surprise." She quoted the J.P. Morgan equity strategist Chris Wolfe, Goldman Sachs

analyst David Fleischer, and Bear Stearns analyst Robert Winters – all of whom believed in

Enron – admitting that they could not piece together how Enron made its money.

30.     The problem was that all along, even though Enron consistently beat

earnings estimates by analysts by at least a penny per share, Enron simply was not providing

answers to the questions about where its profits were coming from. As McLean reported in

March 2001, Enron was giving two responses to concerns about its lack of transparency: (1)

Enron's business is complicated and it would not take the time to explain it; and (2) how Enron

made its money was "proprietary information, like Coca-Cola's secret formula." Later, Carol

Coale, an analyst at Prudential, after she was the first Wall Street analyst to downgrade Enron to

a sell on October 24, 2001, said "The bottom line is, it's really difficult to recommend an

investment when management does not disclose the facts."

31.     Some independent analysts also questioned Enron's value well prior to its

8

demise. A *Forbes.com* study found that, in contrast to sell-side analysts, six of eight independent investment newsletters were recommending that Enron stock be sold prior to November 2001 – three as early as March or April 2001. In a May 6, 2001 research report – nearly seven months before Enron's bankruptcy – the Off Wall Street Consulting Group, an independent research firm based in Cambridge, Massachusetts, suggested that Enron's stock was worth less than half of its then $60 price. Off Wall Street pointed out that Enron's profit margins were declining and would likely continue to decline because, although the revenues from its trading operation – its most profitable division – were increasing, that division's actual profits were shrinking due to growing liquidity and less volatility in the energy markets.[20] Low return on capital was also a bad sign to Off Wall Street that Enron was not getting the benefit it should from its assets and investments.

       32.    Off Wall Street also expressed concern about Enron's heavy reliance on related-party transactions – including the fact that one of the entities with which Enron was trading was headed by CFO Andrew Fastow and the fact that sales to a related party of dark fiber (optical cable not in use) improved earnings in the previous quarter by 4 cents per share, allowing Enron to exceed earnings expectations. Off Wall Street believed – correctly, it turned out – that Enron was resorting to the related-party transactions – transactions with entities controlled by Enron insiders or subsidiaries – to improve earnings appearance, and resorted to them more and more as profits became more elusive. On August 15, 2001, Off Wall Street issued another report on Enron, noting that Enron was selling off assets and booking the payments as income to improve the appearance of profitability in its trading division in the second quarter; meanwhile, Enron was refusing to reveal how much profit it was booking from the sales, so analysts were

9

unable to determine how much of its profits were recurring (from their business, a sign of health), as opposed to non-recurring (from one-time deals, booster-shots to earnings).

33.     In a May 9, 2001 report by *The Street.com* on the May 6, 2001 Off Wall Street research report advising clients to sell Enron stock, the reporter shared the research report on Enron with an unnamed Wall Street analyst bullish on Enron. That Wall Street analyst expressed his view that Off Wall Street misunderstood the energy markets, but agreed that Enron's heavy use of related-party transactions was troubling, remarking, "Why are they doing this? It's just inappropriate."

34.     An even earlier skeptic of Enron was James Chanos, President of Kynikos Associates, a New York investment firm. Chanos began to research Enron after reading a piece in the Texas regional edition of the *Wall Street Journal* on September 20, 2000, entitled "Energy Traders Cite Gains But Math Is Missing," questioning whether Enron's profits, which were largely noncash, were inflated by accounting tricks. Chanos, like Off Wall Street, was concerned about low return on capital, large and frequent insider stock sales, and the general opacity of the company's financial statements. Chanos began shorting Enron's stock – a bet that its price would go down – in November 2000.

### D.     Invesco Strays from its Investment Style and Purchases Enron

35.     Prior to October of 2001, Invesco had purchased 10,130 shares of Enron in the Retirement System's account at $48.69 and $34.35 per share. On October 30, 2001, in the midst of these warning signs about Enron, the Fundamental Value team at Invesco purchased another 19,000 shares of Enron for $11.01 each, for a total purchase price of $210,330 in the Retirement System's account. This new purchase was completely unsuitable for the Retirement

10

System, was not in the best interests of the Retirement System, and was reckless at the time it was done.

36.     Nonetheless, the price of Enron stock stayed close to the $10 range for another two weeks and closed on November 14, 2001 at $10. Invesco had plenty of opportunities to sell the new position for a slight loss, but held onto it until it fell to 40 cents per share, resulting in a loss in excess of $200,000 for the Retirement System on the new purchase of 19,000.

37.     What makes the actions of Invesco even more remarkable is that Invesco did not sell the new position *and* held onto the original 10,150 shares after the announcement on November, 8, 2001, by Enron that it had overstated earnings over the past four years by $586 million and was responsible for $3 billion in obligations that were never reported to the public, in large part due to losses with shady partnerships created by Mr. Fastow. Had Invesco sold the original 10,150 shares along with the new position of 19,000 in the days following November 8, 2001, which would have been prudent, Invesco could have obtained as much as $9 or $10 for the stock through November 19, 2001. That would have saved the Retirement System over $250,000 in losses. The decision not to sell at that time was based upon pure speculation, which is known as risk arbitrage, and was inconsistent with the best interests of the Retirement System and was inconsistent with the Large Cap Growth investment style.

### COUNT I

38.     This is an action for breach of contract. Plaintiffs adopt and reallege the allegations of the previous paragraphs.

39.     Plaintiff Retirement System engaged Defendant Invesco to perform the

11

services that are described above.

40.    Invesco breached the terms of the Management Agreement set forth in paragraph 7 above and the oral agreement set forth in paragraph 9 above by failing to perform as it agreed.

41.    The breach of the duties owing to the Plaintiffs has proximately caused substantial losses to Plaintiffs in an amount in excess of $200,000.

WHEREFORE, Plaintiff prays for entry of judgment awarding compensatory damages, interest and costs against Invesco.

## COUNT II

42.    This is an action for breach of fiduciary duty.  Plaintiffs adopt and reallege the allegations of paragraphs 1 through 37.

43.    Defendant Invesco owed a fiduciary duty to the Plaintiff separate and apart from the terms of the Management Agreement.

44.    Invesco breached the fiduciary duty owing to Plaintiff.

45.    The breach of the fiduciary duty owing to the Plaintiffs has proximately caused substantial losses to Plaintiffs in an amount in excess of $200,000.

WHEREFORE, Plaintiffs pray for entry of judgment awarding compensatory damages, interest and costs.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

12

**PAYTON & CARLSON, P.A.**

*Attorneys for Plaintiffs*

**PAYTON & CARLSON, P.A.**

By: _____

Curtis Carlson
Florida Bar No. 236640
1200 Suntrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Phone: 305.372.3500
Facsimile: 305.372.8265

13

# EXHIBIT 1



**MANAGEMENT AGREEMENT**

### CITIZENS AND SOUTHERN INVESTMENT COUNSELING, INCORPORATED

City of Coral Gables Employees

THIS AGREEMENT, made by ___Special Equity Retirement Trust___ ("Principal") and CITIZENS AND SOUTHERN INVESTMENT COUNSELING, INCORPORATED ("Agent");

### WITNESSETH:

1. (a) Principal hereby employs Agent, and Agent hereby accepts such employment, to provide investment supervision and management of the securities, cash, real estate and other properties now or hereafter listed on an inventory provided Agent by Principal (the "Assets"). The Assets shall be invested and reinvested by Agent in such bonds, notes, debentures, preferred or common stocks, interests in real estate, other securities or other property as Agent in its sole discretion shall determine to be in Principal's best interest.

 (b) In carrying out its obligations and duties hereunder, Agent shall be authorized to obtain any payment due for or in relation to any property held for Principal's account, to sell, transfer or take any other action with relation thereto, including signing Principal's name to or delivering for Principal any assignments, stock or bond powers, proxies, or other documents or instruments which Agent deems necessary or convenient and proper, and to guarantee said signature as Principal's own.

2. Agent will periodically review the securities, cash and other property held for Principal's account, and will retain, sell or exchange the same as Agent shall determine to be for Principal's best interest in Agent's sole discretion. Between periodic reviews, Agent shall take any investment actions which appear to Agent to be advisable considering conditions affecting this account or any property held. At the time of each periodic investment review of the property held in Principal's account (not less frequently than quarterly), Agent will furnish or cause to be furnished to Principal statements showing the market value of the account.

3. Agent will represent Principal in the investment management of the Assets but will not provide custody or safekeeping of the Assets nor collect the income earned by the Assets. Agent shall have the responsibility for monitoring those items requiring action by Principal with respect to investments owned by Principal, such as stock dividends, rights offering, calls or redemptions of bonds, or other items, with respect to which Agent is notified by the custodian of the Assets. Agent is hereby authorized to direct the custodian of the Assets to take any action with respect to the Assets which Agent is authorized to take hereunder. Title to the Assets shall remain in Principal.

4. Agent undertakes to act for Principal loyally and with reasonable skill and diligence, but does not assume responsibility for the payment of any obligations of Principal. Agent may, at its discretion and at the risk of Principal as to authenticity and correctness, accept and act upon such instructions which Agent believes to be genuine, given orally or by telephone, telegraph, cable or other means of communication. Agent shall not be liable for any damages with respect to any matter in connection with this agency, except for gross or wilfull misconduct by Agent. Agent shall have no liability in connection with any act taken or omitted in good faith, and Principal agrees to hold Agent harmless from all liabilities and expenses incurred in connection herewith.

5. Agent shall not be under any duty to institute or defend any legal proceedings on behalf of Principal. In purchasing, selling, delivering or otherwise dealing with the Assets, Agent shall not be deemed by Principal to be acting as, or to make the warranties of, a broker. Agent is under no duty to take any action other than herein specified unless Agent agrees in writing to do so.

6. Principal shall pay the fees set forth in Agent's separate published schedule of fees in effect from time to time, except that no increase in such fees shall be effective until ninety (90) days after written notice thereof is mailed to Principal at Principal's latest address known to Agent.

7. The terms of this Agreement may be altered, amended or changed from time to time by mutual consent.

8. This Agreement is subject to termination by either Principal or Agent upon thirty (30) days written notice to the other party.

9. This Agreement may not be assigned by Agent without the consent of Principal.

PRINCIPAL: SPECIAL EQUITY RETIREMENT TRUST
FOR EMPLOYEES OF THE CITY OF CORAL
GABLES

CITIZENS AND SOUTHERN INVESTMENT
COUNSELING, INCORPORATED:

_____ (SEAL)
James R. Whitley, Finance Director, City of
Coral Gables and Individual Trustee

By: _____
 Authorized Officer

**Richard Paul, Vice President**

Dated: March 31, 1975

36-1085-0

*148*

*1-25-05*

*12:00 PM*

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.    05-01865 CA 11

CITY OF CORAL GABLES
RETIREMENT SYSTEM,

        Plaintiff,

vs.                                          **CIVIL ACTION SUMMONS**

INVESCO  INSTITUTIONAL  (N.A.), INC.,
f/k/a Invesco, Inc., f/k/a Invesco Capital
Management, Inc., f/k/a Citizens &
Southern Investment Counseling, Inc.

        Defendant.
_____/

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:

        YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on
the following Defendant:

        **INVESCO INSTITUTIONAL (N.A.), INC.**
        **By Serving its Registered Agent**
        **CT CORPORATION SYSTEM**
        **1200 S. PINE ISLAND ROAD**
        **PLANTATION, FLORIDA 33324**

        Each defendant is required to serve written defenses to the complaint or petition on Curtis Carlson,
plaintiff's attorney, whose address is 1200 SunTrust International Center, One Southeast Third Avenue.,
Miami, FL 33131, within 20 days after service of this summons on that defendant, exclusive of the day of
service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's
attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that
defendant for the relief demanded in the complaint or petition.

        WITNESS my hand and the seal of said court on _____JAN 21 2005_____, 2005.

                             CLERK OF THE CIRCUIT COURT

                                                             AARON SAMS

By:_____
        Deputy Clerk



## CT System

Service of Process Transmittal Form

Plantation, Florida

01/25/2005

Via Federal Express (2nd Day)

TO:  Jeffrey Kuper General Counsel
INVESCO Institutional (N.A.), Inc.
1360 Peachtree Street, N.E.
Suite 100
Atlanta, GA  30309-0000

RE:    **PROCESS SERVED IN FLORIDA**

FOR      Invesco Institutional (N.A.), Inc. Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

1. TITLE OF ACTION:            City of Coral Gables Retirement System, Pltf. vs Invesco Institutional (N.A.), Inc., etc., Dft.

2. DOCUMENT(S) SERVED:       Summons, Complaint, Exhibit

3. COURT:                     Miami-Dade County Circuit Court, FL
Case Number 05-1585-CA-11

4. NATURE OF ACTION:          Breach of contract and fiduciary duty; failure to perform as agreed pursuant to certain
Management Agreement

5. ON WHOM PROCESS WAS SERVED:      CT Corporation System, Plantation, Florida

6. DATE AND HOUR OF SERVICE:        By Process server on 01/25/2006 at 12:00

7. APPEARANCE OR ANSWER DUE:        Within 20 days

8. ATTORNEY(S):           Curtis Carlson
(305) 372-3500
1200 Suntrust International Center
One Southeast Third Avenue
Miami, FL  33131

9. REMARKS:       Trial by jury demanded.

SIGNED        CT Corporation System

PER

ADDRESS       Donna Moch /TB
1200 South Pine Island Road
Plantation, FL  33324
SOP WS 0008943322

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

MAGISTRATE JUDGE
BANDSTRA

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

CITY OF CORAL GABLES RETIREMENT SYSTEM

**DEFENDANTS**

INVESCO INSTITUTIONAL (N.A.), INC.

CIV-ALTONAGA

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

05-20530

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Curtis Carlson, Payton & Carlson, P.A.,
One Southeast Third Avenue, Miami, FL
33131   305-372-3500

ATTORNEYS (IF KNOWN)
Richard S. Davis, Foley & Lardner LLP, 901
West Tower, 777 So. Flagler Drive, West Palm
Beach, FL 33401   561.655.5050

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

**II. BASIS OF JURISDICTION** *(PLACE AN "X" IN ONE BOX ONLY)*

□ 1 U.S. Government
Plaintiff

□ 2 U.S. Government
Defendant

□ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

1:05CV20530- Altonaga- Bandstra

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | □ 1 | Incorporated or Principal Place of Business In This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business In Another State | □ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** *(PLACE AN "X" IN ONE BOX ONLY)*

□ 1 Original
Proceeding

☒ 2 Removed from
State Court

□ 3 Remanded from
Appellate Court

□ 4 Reinstated or
Reopened

□ 5 Transferred from
another district
(specify)

□ 6 Multidistrict
Litigation

□ 7 Appeal to District
Judge from
Magistrate
Judgment

**V. NATURE OF SUIT** *(PLACE AN "X" IN ONE BOX ONLY)*

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| □ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B□ 610 Agriculture | □ 422 Appeal 28 USC 158 | □ 400 State Reapportionment |
| □ 120 Marine | □ 310 Airplane | □ 362 Personal Injury – Med Malpractice | B□ 620 Other Food & Drug | | □ 410 Antitrust |
| □ 130 Miller Act | □ 315 Airplane Product Liability | □ 365 Personal Injury - Product Liability | B□ 625 Drug Related Seizure of Property 21 USC 881 | □ 423 Withdrawal 28 USC 157 | □ 430 Banks and Banking |
| □ 140 Negotiable Instrument | □ 320 Assault, Libel & Slander | | B□ 630 Liquor Laws | | B□ 450 Commerce/ICC Rates/etc |
| □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 330 Federal Employers Liability | □ 368 Asbestos Personal Injury Product Liability | B□ 640 R.R. & Truck | **A PROPERTY RIGHTS** | □ 460 Deportation |
| B□ 152 Medicare Act | | | B□ 650 Airline Regs | □ 820 Copyrights | □ 470 Racketeer Influenced and Corrupt Organizations |
| B□ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | □ 340 Marine | **PERSONAL PROPERTY** | B□ 660 Occupational Safety/Health | □ 830 Patent | □ 810 Selective Service |
| | □ 345 Marine Product Liability | □ 370 Other Fraud | B□ 690 Other | □ 840 Trademark | □ 850 Securities/Commodities/ Exchange |
| B□ 153 Recovery of Overpayment of Veteran's Benefits | □ 350 Motor Vehicle | □ 371 Truth in Lending | | | □ 875 Customer Challenge 12 USC 3410 |
| □ 160 Stockholders Suits | □ 355 Motor Vehicle Product Liability | □ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | □ 891 Agricultural Acts |
| ☒ 190 Other Contract | □ 360 Other Personal Injury | □ 385 Property Damage Product Liability | □ 710 Fair Labor Standards Act | □ 861 HIA (1395ff) | □ 892 Economic Stabilization Act |
| □ 195 Contract Product Liability | | | □ 720 Labor/Mgmt. Relations | □ 862 Black Lung (923) | □ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | □ 863 DIWC/DIWW (405(g)) | □ 894 Energy Allocation Act |
| □ 210 Land Condemnation | □ 441 Voting | B□ 510 Motions to Vacate Sentence | □ 730 Labor/Mgmt. Reporting & Disclosure Act | □ 864 SSID Title XVI | □ 895 Freedom of Information Act |
| B□ 220 Foreclosure | □ 442 Employment | **HABEAS CORPUS:** | □ 740 Railway Labor Act | □ 865 RSI (405(g)) | □ 900 Appeal of Fee Determination Under Equal Access to Justice |
| □ 230 Rent Lease & Ejectment | □ 443 Housing/ Accommodations | B□ 530 General | | **FEDERAL TAX SUITS** | □ 950 Constitutionality of State Statutes |
| □ 240 Torts to Land | □ 444 Welfare | AC□ 535 Death Penalty | □ 790 Other Labor Litigation | A□ 870 Taxes (U.S. Plaintiff or Defendant) | □ 890 Other Statutory Actions |
| □ 245 Tort Product Liability | □ 440 Other Civil Rights | B□ 540 Mandamus & Other | A□ 791 Empl. Ret. Inc Security Act | A□ 871 IRS – Third Party 26 USC 7609 | A OR B |
| □ 290 All Other Real Property | | B□ 550 Civil Rights | | | |
| | | B□ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Diversity -- 28 U.S.C. § 1332

LENGTH OF TRIAL
via 4 days estimated (for both sides to try entire case)

**VII. REQUESTED IN
COMPLAINT:**

CHECK IF THIS IS A **CLASS ACTION**
□ UNDER F.R.C.P. 23

**DEMAND $** in excess
of $200,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ YES   □ NO

**VIII. RELATED CASE(S)
IF ANY** (See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
2/23/05

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

FOR OFFICE USE ONLY

RECEIPT # 533373   AMOUNT 250 00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____