**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 05-20530-CIV-ALTONAGA/TURNOFF

JC

NIGHT BOX
FILED

APR 2 8 2005

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**CITY OF CORAL GABLES**
**RETIREMENT SYSTEM,**

                Plaintiff,

    v.

**INVESCO INSTITUTIONAL**
**(N.A.), INC.,**

                Defendant.

_____/

**INVESCO'S REPLY MEMORANDUM IN SUPPORT OF**
**INVESCO'S MOTION TO DISMISS**

       The plaintiff's response to INVESCO's pending Motion to Dismiss:  (i) fails to make any effort to rebut INVESCO's demonstration that the Complaint simply does not plead facts constituting "gross or willful misconduct" by INVESCO, the liability standard established by the parties' Management Agreement; (ii) attempts to evade that standard by improper reference to, and reliance on, a state statute that addresses liability standards for retirement system boards, and not investment managers – like INVESCO – that are selected by such boards; and (iii) misapplies the language of the most recent Florida Supreme Court decision on the economic loss rule.  As such, INVESCO's Motion to Dismiss should be granted.

I.    **ARGUMENT**

A.    **Plaintiff's Breach of Contract Claim Should be Dismissed
      Because The Plaintiff Has Not Alleged Facts
      Constituting "Gross or Willful Misconduct"**

1.    **The Plaintiff Has Made No Effort to Rebut INVESCO's
      Demonstration That The Plaintiff Has Not Pleaded
      Facts Rising to the Level of "Gross or Willful Misconduct"**

As discussed in INVESCO's Motion to Dismiss, the plaintiff's Complaint relates to INVESCO's October 30, 2001 purchase, as one of the plaintiff's investment managers, of approximately $210,000 in Enron Corp. stock for the plaintiff. (See Complaint, ¶ 35). The parties' Management Agreement, attached as Exhibit 1 to the Complaint, expressly provides that INVESCO shall not be liable to the plaintiff "except for gross or willful misconduct." (Complaint, Exhibit 1, ¶ 4).

As demonstrated in the Motion to Dismiss, the plaintiff has failed to plead facts meeting this standard, a conclusion amply supported by the very factual allegations of the Complaint (see Motion to Dismiss, pp. 3-4), and by the legal standards and the case law applicable to those facts. (Id., pp. 5-7). In response, the plaintiff does not attempt to discuss any of those facts, or any of the legal standards or case law cited by INVESCO. (See Plaintiff's Response, pp. 2-5). Instead, the plaintiff simply suggests:

> [T]he allegations of the complaint do rise to the level of gross negligence. If this Court determines otherwise, leave should be given to file an amended complaint. [Plaintiff's Response, p. 5].

Plaintiff's silence on this point is telling. As INVESCO has shown, the plaintiff's Complaint, as a matter of law, indisputably fails to plead facts constituting gross or willful

misconduct.  (See Motion to Dismiss, pp. 3-7).  Accordingly, the Court should dismiss the plaintiff's Count I breach of contract claim.

> 2.     **The Liability Standard in the Parties' Management Agreement is Not Superseded By a State Statute <u>Governing the Liabilities of Retirement System Boards</u>**

To attempt to escape this result, the plaintiff makes a rather tortured and improper argument that the Management Agreement's liability standard somehow is superseded by a state statute governing the conduct of retirement system boards.  The Court should squarely reject that argument.

As the plaintiff points out, a provision of the Florida Protection of Public Employee Retirement Benefits Act, Fla. Stat. § 112.60, <u>et seq.</u>, provides that a retirement system "<u>board</u> in performing its investment duties shall comply with the fiduciary standards set forth in the Employee Retirement Income Security Act of 1974 at 29 U.S.C. s. 1104(a)(1)(A)-(C)."  <u>See</u> Fla. Stat. § 112.661(4).  The referenced provision of ERISA imposes a "prudent man" standard. (<u>See</u> Plaintiff's Response, p. 4).[1]  However, because money managers – like INVESCO – are not

---

[1] ERISA itself is inapplicable to this matter because ERISA does not apply to a "governmental plan" established or maintained "by the government of any State or political subdivision thereof."  <u>See</u> 29 U.S.C. §§ 1002(32) and 1003(b)(1).

by definition, retirement system "boards", the statute cited by the plaintiff is inapplicable to this matter.[2]

In addition, Fla. Stat. § 112.66(4) does not negate the "gross or willful misconduct" standard in the parties' Management Agreement, notwithstanding the plaintiff's suggestion to the contrary. (See Plaintiff's Response, p. 5). That statute provides that "[a]ny provision in a legal agreement, contract, or instrument which purports to relieve a fiduciary of a retirement system or plan from responsibility or liability is void as being against public policy." The Management Agreement does no such thing. By its own language, the Agreement does not "relieve" INVESCO of liability for its conduct; rather, it simply sets a standard for such conduct. As such, and consistent with the Florida statute, if INVESCO had engaged in the type of conduct proscribed by the Agreement (which INVESCO did not), INVESCO would be liable for its actions.

Accordingly, because the plaintiff has not pleaded facts constituting "gross or willful misconduct" by INVESCO, and because the plaintiff has not demonstrated any statutory or other legal impediment to the Court's application of that contractually agreed-upon standard, the Court should dismiss the plaintiff's Count I breach of contract claim.

_____

[2] Fla. Stat. § 112.625(8) defines the term "board" to mean "the person or persons so designated by the terms of the instrument or instruments, ordinance or statute under which the [retirement system] plan is operated." Section 19-32(29) of the Coral Gables City Code defines the term "retirement board" to "mean[] the board established pursuant to section 19-56 for administration of the system." Section 19-32(21) of the Code defines the term "money manager" as the person or entity appointed by the board "for the purpose of investing and reinvesting the corpus, income, contributions and other monies received by the system." For the Court's convenience, copies of the city code provisions referenced in this memorandum are attached hereto as Exhibit A.

**B.**    **Plaintiff's Breach of Fiduciary Duty Claim
Is Barred by The Economic Loss Rule**

1.    **The Florida Supreme Court's Decision in <u>Indemnity Insurance</u>
Confirms That The Economic Loss Rule Bars
<u>Tort Claims Between Parties in Contractual Privity</u>**

Likewise, plaintiff's second claim against INVESCO – its breach of fiduciary

duty claim – should be dismissed, because the claim is barred by Florida's economic loss rule.

As both parties acknowledge, the Florida Supreme Court's December 23, 2004

decision in <u>Indemnity Insurance Co. v. American Aviation, Inc.</u>, 891 So. 2d 532 (Fla. 2004) is

critical to the disposition of this issue.  In <u>Indemnity Insurance</u>, the Florida Supreme Court

stated:

> A party to a contract who attempts to circumvent the contractual
> agreement by making a claim for economic loss in tort is, in effect,
> seeking to obtain a better bargain than originally made.  Thus, when the
> parties are in privity, contract principles are generally more appropriate for
> determining remedies for consequential damages that the parties have, or
> could have, addressed through their contractual agreement. . . .
>
> [W]e reiterate that when the parties have negotiated remedies for
> nonperformance pursuant to a contract, one party may not seek to obtain a
> better bargain than it made by turning a breach of contract into a tort for
> economic loss.  [<u>Id.</u> at 536-37, 542].

The court also stated that this principle is subject to certain established

exceptions, such as the exceptions for fraud in the inducement claims, or allegations of neglect in

providing professional services.  <u>See</u> <u>Indemnity Insurance</u>, 891 So. 2d at 537 and 543.  However,

the plaintiff does not contend, and cannot contend, that its breach of fiduciary duty claim is

subject to one of those exceptions.

007.162544.1

Instead, in its argument, the plaintiff relies on two decisions issued by the Florida Third District Court of Appeal, which interpreted <u>dicta</u> from the 1999 Florida Supreme Court decision in <u>Moransais v. Heathman</u>, 744 So. 2d 973 (Fla. 1999) as suggesting that the economic loss rule does not bar breach of fiduciary duty claims. (<u>See</u> Plaintiff's Response, pp. 6-7). The plaintiff then argues that because the Florida Supreme Court merely acknowledged one of those decisions in its opinion in <u>Indemnity Insurance</u>, this Court must reach the same result as the District Court of Appeal. (<u>See</u> Plaintiff's Response, p. 9, stating that "the [Florida Supreme] Court had a chance to limit or overrule [one of the District Court of Appeal decisions], but did neither").

The plaintiff is wrong. In <u>Indemnity Insurance</u>, the Florida Supreme Court affirmatively stated, while ruling on the applicability of the economic loss rule to negligence claims between parties not in contractual privity, that "we express no opinion on the existence of a cause of action or the appropriateness of recovery for certain types of economic damages in individual cases." <u>Indemnity Insurance</u>, 891 So. 2d at 543. It is hornbook law that "no decision is authority on any question not raised and considered," <u>see, e.g.</u>, <u>Benson v. Norweigian Cruise Line Ltd.</u>, 859 So. 2d 1213, 1217 (Fla. 3rd DCA 2003) (citation omitted), and that when a federal court sits in diversity – as here – "[t]he rulings of the highest court of the forum state control [its] decision." <u>Admiral Insurance Co. v. Feit Management Co.</u>, 321 F.3d 1326, 1328 (11th Cir. 2003). As such, the Florida Supreme Court's silence in the <u>Indemnity Insurance</u> decision concerning the import of the economic loss rule to breach of fiduciary duty claims cannot possibly be construed as "authority" on that issue. Rather, the decision's express language reaffirming the application of the economic loss rule to claims between parties in contractual

privity – as quoted above – should guide this Court in determining the propriety of the plaintiff's breach of fiduciary duty claim.

In that regard, and as demonstrated by INVESCO's Motion to Dismiss, at least three federal courts – subsequent to the <u>Moransais</u> decision, prior to the <u>Indemnity Insurance</u> decision, and notwithstanding the above-referenced intervening Third District Court of Appeal decisions – have determined that the economic loss rule does bar breach of fiduciary duty claims between parties who are in contractual privity.  (<u>See</u> Motion to Dismiss, pp. 11-12).  Because the <u>Indemnity Insurance</u> opinion buttresses these rulings, INVESCO respectfully submits that this Court should reach the same decision.[3]

### 2.    Various Arguments Presented by Plaintiff Provide No Basis For Sustaining the Plaintiff's Breach of Fiduciary Claim

In addition, several miscellaneous arguments presented in the plaintiff's response memorandum provide no basis for allowing the plaintiff's breach of fiduciary duty claim to proceed.  First, as demonstrated above, the liability standard in the parties' Management Agreement is not superseded by the Florida Statutes.  (<u>Contra</u> Plaintiff's Response, p. 10).  Second, Judge Martinez did not rule, in the slip opinion attached to the plaintiff's response memorandum, that breach of fiduciary duty claims may proceed, notwithstanding the economic

---

[3] Just before INVESCO filed its Motion to Dismiss, this Court issued its opinion in <u>Maliner v. Wachovia Bank, N.A.</u>, No. 04-60237CIV, 2005 WL 670293 (S.D. Fla. March 1, 2005), a decision that INVESCO's undersigned counsel located online while preparing this reply memorandum.  While the Court ruled in <u>Maliner</u> that the economic loss rule does not bar breach of fiduciary duty claims, and briefly addressed the <u>Indemnity Insurance</u> decision, <u>id.</u> at *7-8, the Court did not have the benefit in that case of briefing on the import of the <u>Indemnity Insurance</u> decision, nor of much of the case law cited by INVESCO.  As such, INVESCO continues to believe that its argument herein is well-founded and meritorious.

loss rule.  Instead, Judge Martinez simply found that "there is a <u>possibility</u> that the Florida

Supreme Court would hold that an exception to the economic loss rule exists for a breach of

fiduciary duty cause of action."  (Plaintiff's Response, Exhibit A, p. 8).  Finally, the plaintiff's

breach of fiduciary duty claim does not present an "independent tort."  (<u>Contra</u> Plaintiff's

Response, p. 11).  As demonstrated by the case law cited by INVESCO, a tort is committed

independently of a contractual breach when "it requires proof of facts separate and distinct from

the breach of contract," a situation not present here.  (<u>See</u> Motion to Dismiss, pp. 9-10).

## II.    **<u>CONCLUSION</u>**

Wherefore, for the reasons stated in its Motion to Dismiss, and in this reply

memorandum, INVESCO respectfully requests that the Court dismiss the plaintiff's Complaint.

007.162544.1

**I HEREBY CERTIFY** that a true and accurate copy of this INVESCO's Reply

Memorandum in Support of INVESCO's Motion to Dismiss has been furnished by U.S. mail to

CURTIS CARLSON, PAYTON & CARLSON, P.A., 1200 Suntrust International Center, One

Southeast Third Avenue, Miami, Florida  33131, this 28th day of April, 2005.


Richard S. Davis
Florida Bar No. 991082
FOLEY & LARDNER LLP
777 South Flagler Drive
Suite 901 -- West Tower
West Palm Beach, Florida  33401
Telephone:     (561) 650-0140
Facsimile:     (561) 655-6925
E-mail:rdavis@foley.com

James M. Landis
Florida Bar No. 0116760
FOLEY & LARDNER LLP
100 North Tampa Street
Suite 2700
Tampa, Florida  33602
Telephone:     (813) 229-2300
Facsimile:     (813) 221-4210
E-mail:jlandis@foley.com

*Attorneys for defendant*
*INVESCO Institutional (N.A.), Inc.*

-9-

Case 1:05-cv-20630-CMA  Document 24  Entered on FLSD Docket 04/29/2005  Page 10 of 19

## ARTICLE II. RETIREMENT SYSTEM FOR CITY EMPLOYEES*

---------

**\*Editor's note:** Ord. No. 2887, § 1, adopted Nov. 21, 1989, amended the city's general retirement system provisions in their entirety, in effect repealing former §§ 19-26--19-42, 19-56--19-63, 19-76--19-80, and 19-96--19-112 of this article and enacting similar new provisions in lieu thereof which have been codified as set out herein at the discretion of the editor. Formerly, this article derived from §§ 22-1--22-47 of the city's 1958 Code.
Ord. No. 3467, § 3, adopted July 11, 2000, states that the provisions of said ordinance shall be retroactively effective on December 31, 1999 in accordance with the requirements of Chapter 99-1, Laws of Florida.
Further, Ord. No. 3512, § 3, adopted July 10, 2001, states that the provisions of said ordinance shall be retroactively effective on Dec. 31, 2000 in accordance with the requirements of Chapter 99-1, Laws of Florida. See the Code Comparative Table for a detailed analysis of amended subsections.

---------

## DIVISION 1. GENERALLY

### Sec. 19-26. Authorization.

A retirement system to be administered in accordance with the provisions of this article is hereby created.

(Ord. No. 2887, § 1(22-1), 11-21-89)

### Sec. 19-27. Reservation of other systems; transfer of funds.

Any person who as of the effective date of this article has retired under the provisions of Ordinance No. 483 shall continue to be governed by the terms of Ordinance No. 483. All funds administered by the board of trustees pursuant to the provisions of Ordinance No. 483 shall be transferred intact to the trust provided herein.

(Ord. No. 2887, § 1(22-2), 11-21-89)

### Sec. 19-28. Purpose.

The purpose of this retirement system is to provide benefits to regular and permanent employees of the city and their beneficiaries upon the occurrence of retirement, death or disability of the employee.

(Ord. No. 2887, § 1(22-3), 11-21-89)

### Sec. 19-29. Name.



EXHIBIT

A

The system hereby created shall be known as the Coral Gables Retirement System. All the affairs and business of such system shall be transacted in such name.

(Ord. No. 2887, § 1(22-4), 11-21-89)


### Sec. 19-30. Effective date.

The retirement system hereby created shall become effective as of January 1, 1957.

(Ord. No. 2887, § 1(22-5), 11-21-89)


### Sec. 19-31. Applicability.

(a)    The retirement system shall be applicable to each employee in the regular and permanent service of the city.

(b)    Written application must be made for early, normal and disability retirement under this system prior to retirement.

(c)    Application for participation in the DROP Plan will be governed by section 19-129 (b).

(d)    Benefit improvements adopted by amendments to this Chapter 19 shall apply prospectively and shall not apply to participants who terminate employment or who retire prior to the effective date of any amendment to this Chapter 19 adopting such benefit improvements unless such amendment specifically provides to the contrary.

(Ord. No. 2887, § 1(22-6), 11-21-89; Ord. No. 3360, § 1, 11-10-98; Ord. No. 3467, § 1, 7-11-00)

**Editor's note:** See editor's note at article title.


### Sec. 19-32. Definitions.

For purposes of this article, the following words and phrases shall have the meanings stated below unless a different meaning is plainly required by the context.

(1)    *City* means the City of Coral Gables, Florida.

(2)    *Retirement system* or *system* means the Coral Gables Retirement System established by this article.

(3)    *Administrative manager* means the person or entity appointed from time to time pursuant to section 19-77 of this article to provide administrative services set forth in section 19-78.

(4)    *Appointed officials* means the city manager, the city clerk, the city attorney, and the assistant city attorney.

(5)    *Beneficiary* means the individual or individuals designated by the participant pursuant to the provisions of section 19-116 of this article.

(6)    *Compensation* means:

a.    As to hourly paid employees, hourly wages, inclusive of shift differential, loyalty steps, special assignment, educational incentives, plus any workers' compensation benefits received by the employee;

b.    As to salaried employees, salary only exclusive of all other

remuneration, plus any workers' compensation benefits received by the employee.

(7)  *Contingent beneficiary* means the individual or individuals designated by the participant pursuant to the provisions of section 19-116 of this article.

(8)  *Credited service* means:

a.  Except as modified by paragraph b. of this subsection, the total period of the participant's continuous service with the city, computed in years and a fraction thereof to completed months.

b.  The period of any absence in excess of thirty (30) days will be excluded from a participant's credited service unless he receives compensation from the city during such absence; or unless the absence is a qualified leave within the scope of the Family and Medical Leave Act and the absence is no longer than the maximum time allowed under that Act. However, the first two (2) years of any absence after the effective date of this article due to the participant's engagement in the military service will be included in his credited service if such absence is covered by a leave of absence granted by the city or if such absence is by reason of compulsory military service. A participant may purchase credited service for up to five (5) years of the time spent in the military service of the Armed Forces of the United States which time shall be added to the years of actual service if (a) the participant is in the active employment of the city prior to such service and leaves a position, other than a temporary position, for the purpose of voluntary or involuntary service in the Armed Forces of the United States; (b) the participant is entitled to reemployment under the provisions of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"); and (c) the participant returns to the participant's employment in the participant's prior occupation with the city within one (1) year from the date of the participant's release from such active service as provided by Chapters 175 and 185, Florida Statutes (or within a longer period of time in accordance with USERRA). Credited service for time spent in the armed forces pursuant to this paragraph may be purchased in accordance with the procedures set forth in section 19-34. Any participant who is absent prior to the effective date of this article [Dec. 31, 2000] because of an engagement in military service will be credited for the full period of such service. Provided, however, each participant in the service of the city as of January 1, 1957, shall have credited service as of such date as computed under Ordinance No. 483. No participant in the system who was first employed by the city on or after October 1, 1980, shall be allowed to receive credited service for any period of time with respect to which the participant is already receiving, or will receive in the future, a retirement benefit or pension from another retirement system or plan, other than federal social security and military retirement benefits. Subsections (30) and (22) of this section to the contrary notwithstanding, participants of the system will have the option to receive credited service for all purposes of this system for time while in the United States military service in accordance with the provisions of section 19-34 of this article.

(9)  *Disability* means either a permanent and total incapacity or temporary and total incapacity due to injury or illness.

(10)  *Permanent and total disability* means: A participant will be considered totally disabled if, in the opinion of the retirement board (subject to the limitations of section 19-68 of this article and the review procedures of section 19-126 of

this article), such participant is unable to engage in the participant's own occupation for wage or profit because of mental or physical incapacity resulting from a cause other than as specified in section 19-112. A participant will be considered permanently disabled if, in the opinion of the retirement board (subject to the limitations of section 19-68 and the review procedures of section 19-126 of this article), such participant is likely to remain unable to engage in the participant's own occupation for wage or profit continuously and permanently from a cause other than as specified in section 19-112. The determination of whether a firefighter or police officer is unable to engage in his or her own occupation shall be determined in accordance with Chapters 175 and 185, Florida Statutes.

(11)    *Temporary and total disability* means a participant determined to be totally disabled as defined in subsection (9) above resulting from a cause other than as specified in paragraph (b) of section 19-112, but such disability may not likely be irrevocably permanent.

(12)    *Disability retirement* means retirement from the service of the city due to either a service connected disability or a nonservice connected disability.

(13)    *Service connected disability* means total and permanent disability arising from and out of and directly attributable to the participant's discharge of his duties in the course of his employment with the city.

(14)    *Nonservice connected disability* means total and permanent disability not arising from and out of or not directly attributable to the employee's discharge of his duties in the course of his employment with the city, but the participant, prior to the disability, had at least ten (10) years of credited service with the city.

(15)    *Early retirement date* means the first day of any month coincident with or next following the satisfaction of the following requirements, but before the participant's normal retirement date:

    a.    Attainment of age forty-seven (47);

    b.    Completion of at least twenty-five (25) years of credited service; and

    c.    Written notification to the retirement board through the administrative manager of the intent to retire. Such notification must be received by the administrative manager at least ninety (90) days prior to the intended early retirement. This notification requirement will be waived for employees who have a nonservice connected disability and who are otherwise eligible for early retirement.

Provided, however, that the foregoing shall not apply to firefighters, as to whom the following shall apply:

Early retirement date means the first day of any month coincident with or next following the date the participant attains the age of fifty (50) and completes ten (10) years of credited service. Written notification to the retirement board through the administrative manager of the intent to retire. Such notification must be received by the administrative manager at least ninety (90) days prior to the intended early retirement. This notification requirement will be waived for employees who have a nonservice connected disability and who are otherwise eligible for early retirement.

(16)    *Employee* means any person employed by the city on a regular full time basis, and any member of the city commission, regardless of whether the commissioner is employed full time. Any person (other than a commissioner) employed by the city on a part-time or temporary basis, or on any other basis or

arrangement under which his employment with the city does not constitute his principal employment for less than thirty-two (32) hours a week or for less than fifty-two (52) weeks a year shall not be an "employee" as that term is defined and used in the system.

(17)    *Firefighter* means any employee of the city who meets the definition of firefighter contained in section 175.032(8)(a), Florida Statutes.

(18)    *Highest three-year average* means the sum of the total earnings of a participant for the three (3) years in which the participant's total earnings were the highest preceding the date of termination of service or actual retirement date, divided by three (3). The three years may, but need not, be consecutive years, but may not overlap. For the purpose of this subsection, a year means twenty-six (26) consecutive full biweekly payroll periods. If a participant has less than three (3) twenty-six (26) consecutive full biweekly payroll periods at his termination of service or actual retirement date, the total earnings in the actual number of full pay periods will be divided by the actual number of years and fractional parts represented by the full pay periods worked.

(19)    *Interested parties* means claimants for retirement benefits, the administrative manager, the retirement board and the city manager.

(20)    *Investment committee* means the committee established pursuant to section 19-72 of this article to perform the duties and have the responsibilities described in section 19-73.

(21)    *Money manager* means the person or entity appointed from time to time pursuant to section 19-79 for the purpose of investing and reinvesting the corpus, income, contributions and other monies received by the system.

(22)    *Leave of absence* means absence from the active service of the city by reason of illness, military service, or for any other reason which will not terminate a participant's service, provided he returns to the active employment of the city prior to the expiration of his leave, or if not specified therein, within the period of time which accords with the city's policy with respect to permitted absences. If the participant does not return to the active employment of the city prior to the expiration of his leave of absence as above defined, his service will be considered terminated as of the date on which his leave began. Absence from the active service of the city because of engagement in military service will be considered a leave of absence granted by the city and will not terminate the service of a participant if he returns to active employment of the city within the period of time during which he has reemployment rights under any applicable federal law.

(23)    *Monthly compensation* means compensation received for the last two (2) full biweekly payroll periods.

(24)    *Normal retirement* means retirement from the service of the city on or after the normal retirement date.

(25)    *Normal retirement date* means the first day of the month coincident with or next following the first to occur of the following dates:

    a.    Date on which the participant attains sixty-five (65) years of age, irrespective of the number of years of credited service, at which time the participant shall be deemed fully vested, irrespective of the number of years of credited service (effective retroactively to all plan years beginning after December 31, 1975);

    b.    The date on which the participant's fully credited years of service

and chronological age sum total seventy (70), which may include military service; or

c.      The date on which a retiree or vested employee who no longer is employed by the city attains fifty-two (52) years of age.

(26)      *Participant* means an employee or former employee of the city who is or may become eligible to receive benefits from the system pursuant to the provisions of this article.

(27)      *Period of disability* means the period during which the participant is continuously absent from fulltime duty with the city due to a disability until the participant has completed thirty (30) days of fulltime employment with the city in the same classification, and performing the full duties of that classification as before the absence due to the disability.

(28)      *Police officer* means any employee of the city who meets the definition of police officer contained in section 185.02(11), Florida Statutes.

(29)      *Retirement board* means the board established pursuant to section 19-56 for administration of the system.

(30)      *Service* means that period of continuous, uninterrupted employment with the city from the participant's last date of employment to the earlier of his termination of employment or his actual retirement date. Any absence from the active service of the city, including but not limited to absences by reason of discharge or resignation, which is not deemed a leave of absence as defined in subsection (22) of this section, will be considered a termination of service.

(31)      *Service connected death* means death of the participant which occurs as a result of the discharge of duties in the course of his employment by the city.

(32)      *Special assignment* means an assignment of nonspecific duration for which an employee receives additional remuneration for as long as he is engaged in performing the assignment. This will not include temporary replacement assignments, but shall include other assignments as defined by the applicable collective bargaining agreement.

(33)      *Total earnings* means all remuneration paid by the city to the employee, including compensation, overtime, educational payments shift differentials, special assignments, and the like, but exclusive of lump-sum payments for unused annual and sick leave upon employee termination, or of the value of any automobile furnished to the employee by the city, and uniform, equipment and like allowances. (Definition as amended September 23, 1998 is retroactive to November 21, 1989, at which time by re-enactment of the retirement ordinance, the city continued the established policy of excluding lump-sum payments of unused annual and sick leave in calculating total earnings upon termination.)

(34)      *Trust agreement* means the written instrument by and between the trustee and the city commission establishing and governing the administration of the trust fund established and maintained for the purposes set forth in section 19-91 of this article.

(35)      *Trust fund* means the trust established pursuant to the trust agreement by and between the trustee and the city commission for the purposes set forth in this article.

(36)      *Trustee* means the person designated by section 19-92 for administration of the trust fund.

(37)      *Vested* means a regular fulltime employee who has attained ten (10)

years of credited service with the city.

(38)     *With cause* means reasonable grounds supported by facts and circumstances sufficient to convince a prudent person that an improper action has been or is about to be committed.

(39)     *Other public employer* means an employer other than the city which had established and maintained a pension plan which is a "governmental plan," as that term is defined in section 3(32) of the Employee Retirement Income Security Act of 1974, as amended through December 31, 1988, 29 U.S.C. State Statute 1002(32), in which the participant had accrued years of service for participation purposes in that plan.

(40)     *Full year* means a "year of service" earned by the participant under the other public employer's plan, exclusive of any past service credit for any years of service during which the participant was not actually employed by the other public employer and exclusive of any multiples of a year credited for any year of employment. If the retirement board is unable, after a reasonable inquiry, to determine the "year of service" under the other public employer's plan, then "full year" refers to a twelve-consecutive-month period of fulltime active employment with the other public employer.

(41)     Starting salary means compensation (as defined in subsection (6) of this section) paid the individual during the individual's first full twenty-six (26) biweekly payroll periods of the individual's current period of employment with the city.

(42)     *Deferred retirement option plan* or *DROP* means an election an eligible employee may make pursuant to section 19-129 to retire for all purposes of the plan and defer receipt of retirement benefits into a DROP account while continuing employment with the city for up to (but not to exceed) an additional ninety-six (96) months for all participants except police sergeants, police lieutenants and police officers covered by the collective bargaining agreement or an additional sixty (60) months for police sergeants, police lieutenants and police officers covered by the collective bargaining agreement.

(Ord. No. 2887, § 1(22-7), 11-21-89; Ord. No. 2907, § 1, 4-24-90; Ord. No. 2936, § 1, 4-23-91; Ord. No. 2937, § 1, 4-23-91; Ord. No. 2971, § 1, 1-28-92; Ord. No. 3054, § 1, 12-14-93; Ord. No. 3279, § 1, 10-14-97; Ord. No. 3342, § 1, 9-23-98; Ord. No. 3360, § 1, 11-10-98; Ord. No. 3446, § 1, 2-22-00; Ord. No. 3467, § 1, 7-11-00; Ord. No. 3512, § 1, 7-10-01)

**Editor's note:** See editor's note at article title.

## Sec. 19-33. Compulsory participation.

Each employee in the service of the city shall, as a condition of employment, become a participant in the retirement system as of the employee's date of employment and will be subject to all provisions of the system beginning on such date.

Provided, however, it shall not be mandatory for any appointed official of the city to participate in the system, but such appointed official shall have the option of participation in the system. In the event that any of the appointed officials elect to participate in a retirement plan other than the system, the city will contribute a sum not to exceed six and one-half (6 1 / 2 ) percent of the appointed official's compensation to that plan.

(Ord. No. 2887, § 1(22-8), 11-21-89; Ord. No. 3467, § 1, 7-11-00)

**Editor's note:** See editor's note at article title.

Case 1:05-cv-20530-CMA Document 24 Entered on FLSD Docket 04/29/2005 Page 17 of 19

(Ord. No. 2887, § 1(22-65), 11-21-89)

Sec. 19-40. Reserved.

**Editor's note:** Ord. No. 3467, § 1, adopted July 11, 2000, repealed § 19-40 in its entirety. Formerly said section pertained to other pensions. See the Code Comparative Table.

### Sec. 19-41. Named fiduciaries.

The named fiduciaries with respect to the retirement system having the authority to control and manage the administration of the system are: the retirement board members; the trustee; the administrative manager; the investment committee; and the money manager(s).

(Ord. No. 2887, § 1(22-67), 11-21-89)

Sec. 19-42. Reserved.

**Editor's note:** Ord. No. 3467, § 1, adopted July 11, 2000, repealed § 19-42 in its entirety. Formerly said section pertained to simultaneous service in multiple positions. See the Code Comparative Table.

Secs. 19-43--19-55. Reserved.

## DIVISION 2. ADMINISTRATION

### Sec. 19-56. Retirement board--Administration.

The administration of the system, subject to the limitations herein set forth, will be the responsibility of the retirement board consisting of nine (9) members, which is hereby established.

(Ord. No. 2887, § 1(22-32), 11-21-89)

### Sec. 19-57. Same--Selection of members.

The nine (9) retirement board members shall be selected as follows:

(1) *Participant retirement board members.* Three (3) participating, regular fulltime employees, one (1) of whom shall be elected by the participating police officers, one (1) of whom shall be elected by the participating firefighters and the third member shall be elected by the participating employees other than police officers and firefighters. Such elections are governed by rules and regulations as adopted by the retirement board.

(2) *Nonparticipating retirement board members.* Five (5) citizens of the city who are not participants are to be appointed by the city commission.

(3) *At large retirement board member.* One (1) individual, who shall be a participating, regular fulltime employee of the city, shall be elected by all current fulltime participating employees.

(Ord. No. 2887, § 1(22-33), 11-21-89; Ord. No. 2923, § 1, 10-24-90)

participants and beneficiaries of the system.

(8)    Maintain statistical data for the retirement board, the trustee, auditor, actuary and city commission, and as are needed or required.

(9)    Assist in the design and development of communication booklets, brochures and forms, and arrange for distribution of required materials to participants and beneficiaries of the system.

(10)    At the request of the auditor or accountant, assist in the preparation of all reports and other documents to be prepared, filed or disseminated by or on behalf of the retirement board in accordance with law.

(11)    Establish and control the system's benefit claims operation to insure prompt and accurate review and determination of participant and beneficiary claims for benefits under the system, to include but not be limited to the following specific functions:

a.    Respond to all inquiries from participants and beneficiaries with respect to applicable benefit provisions of the system.

b.    Draft and revise all required claim forms.

c.    Provide the necessary claim forms to participants and beneficiaries upon request.

d.    Provide assistance to participants and beneficiaries in the completion of claim forms.

e.    Initiate written rules and regulations (subject to review and revision by the retirement board) for the receipt of and investigation by the administrative manager of claims for benefits, including documentation requirements in support of claims submitted.

f.    Following receipt and review of benefit claims and supporting documentation, and such investigation as the administrative manager deems necessary, make an initial determination as to eligibility for benefits and the appropriate level of benefits.

g.    Provide notice to interested parties of the administrative manager's initial claim determination.

h.    Initiate written procedures (subject to review and revision by the retirement board) for the processing of requests for review of the administrative manager's initial claim determination by the retirement board.

i.    Perform such other duties and furnish such other services as may be assigned, delegated, or directed by or on behalf of the retirement board.

(Ord. No. 2887, § 1(22-54), 11-21-89)


## Sec. 19-79. Money manager--Selection, qualification, performance review, term and removal.

(a)    *Selection.* One (1) or more money manager(s) to perform the duties and have the responsibilities set forth in section 19-80 of this article shall be selected by the retirement board from a list of not more than three (3) candidates proposed by the investment committee. An independent consultant may be utilized by the investment committee, if needed.

Case 05-cv-20500-CMA Document 24 Entered on FLSD Docket 04/29/2005 Page 19 of 46

(b)  *Qualifications.* The money manager must either be:

(1)  Registered as an investment advisor under the Investment Advisors Act of 1940;

(2)  A bank, as defined in the Investment Advisors Act of 1940; or

(3)  An insurance company qualified to manage, acquire or dispose of assets of an employee benefit plan under the laws of more than one (1) state; and

(4)  Have acknowledged in writing that he is a fiduciary with respect to the system.

(c)  *Performance review.* Performance of the money manager(s) is to be reviewed not less often than every three (3) years by an independent consultant professionally qualified to evaluate the performance of professional money managers. This independent consultant is to be selected by the investment committee.

(d)  *Term and removal.* Money manager(s) shall serve at the will and pleasure of the retirement board and is/are subject to removal by the retirement board, with or without cause, on reasonably short notice and without penalty.

(Ord. No. 2887, § 1(22-55), 11-21-89)

## Sec. 19-80. Same--Duties and responsibilities.

The money manager(s) shall be responsible for the investment and reinvestment of all assets of the system. In furtherance of this responsibility, the money manager(s) shall have all powers, duties and responsibilities with regard to such investment and reinvestment, and act as the system's agent(s) in fact with full authority to buy, sell or otherwise effect investment transactions involving the assets of the system in the name of the system, the trustee or the trust fund and for the system's account. Such powers, duties and responsibilities shall be exercised exclusively by the money manager(s) pursuant to and in accordance with those provisions of this article and any applicable law which relate to such powers, duties and responsibilities. In deciding on a proper investment of the assets, the money manager(s) shall consider the following factors and such other factors as may be communicated in writing to the money manager(s) from time to time: The purpose of the system, the system's financial needs such as liquidity, applicable laws and the system's investment policies and guidelines. The money manager(s) shall also provide assistance in the field of its expertise to the retirement board, the trustee and the investment committee in the development, review and revision of the system's investment policies and guidelines.

(Ord. No. 2887, § 1(22-56), 11-21-89)

## Sec. 19-81. Same--Accounting and reports.

The money manager(s) shall furnish the retirement board, trustee, investment committee, requesting participants, and city manager with quarterly investment reports showing the assets and market values for each security included in the assets shortly after the end of each calendar quarter. The money manager(s) shall keep true and accurate accounts of all investments, receipts and disbursements and other transactions relative to the assets.

(Ord. No. 2887, § 1(22-57), 11-21-89; Ord. No. 3279, § 1, 10-14-97)

## Sec. 19-82. Liability for actions of money manager.